**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**KANSAS CITY DIVISION**

| | | |
|---|---|---|
| **PIPELINE PRODUCTIONS, INC.,** | ) | |
| **MICHAEL EDMONDSON,** | ) | |
| **BRETT MOSIMAN,** | ) | |
| **PLT, LLC,** and | ) | |
| **MIDWEST PRODUCTION SERVICES, LLC,** | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 4:20-cv-00130-RK** |
| | ) | |
| v. | ) | <u>**JURY DEMANDED**</u> |
| | ) | |
| **S&A PIZZA, INC.,** | ) | |
| **JEFFREY "STRETCH" RUMANER,** | ) | |
| **CROSSROADS LIVE, LLC,** | ) | |
| **MAMMOTH, INC.,** | ) | |
| **JEFF FORTIER, JOSH HUNT** | ) | |
| **JACKI BECKER, and** | ) | |
| **UP TO ELEVEN PRODUCTIONS,** | ) | |
| | ) | |
| Defendants. | ) | |

<u>**AMENDED COMPLAINT**</u>

COME NOW Plaintiffs Pipeline Productions, Inc. ("Pipeline"), Michael Edmondson, Brett Mosiman, PLT, LLC ("Ticketing") and Midwest Production Services, LLC ("MPS"), and for their Complaint against Defendants S&A Pizza, Inc. ("S&A"), Jeffrey "Stretch" Rumaner, Crossroads Live, LLC ("Company"), Mammoth, Inc. ("Mammoth"), Jeff Fortier, Josh Hunt, Jacki Becker, Up to Eleven Productions ("Eleven"), and state and allege as follows:

1

## INTRODUCTION

1.      This case arises from Rumaner's attempt (through S&A) to steal the Company's business, reputation, and assets from its other members, Pipeline and Edmondson, to prop up his own failing business interests. After 13 seasons in which Pipeline and Edmondson contributed approximately $900,000 to open the Company, made leasehold improvements, and covered losses, S&A, which contributed little to no money, locked Pipeline and Edmondson out of CrossroadsKC and terminated its lease to the Company shortly after two of Rumaner's Grinder's locations went out of business.

2.      S&A did not take these actions so that Rumaner could sell the property or run a different type of business on the property. Rather, it took them to produce and operate concerts at the same venue for Rumaner's own personal profit, after conspiring with Mammoth, Fortier, Hunt, Becker, and Eleven to do so. Mammoth, Fortier, Hunt, Becker, and Eleven greatly benefitted by stealing a successful venue with an impeccable reputation and a loyal customer base.

3.      Plaintiffs bring this action against Defendants for breach of contract, breach of fiduciary duty, unjust enrichment, tortious interference with contract, tortious interference with a business expectancy, defamation, violation of the Missouri Computer Tampering Act, false association and false advertising under the Lanham Act, unfair competition, and misappropriation of trade secrets. Plaintiffs further seek dissolution of the Company.

## PARTIES

4.      Plaintiff Pipeline Productions, Inc. ("Pipeline") is a Kansas corporation with its principal place of business in Lawrence, Kansas. At all times relevant hereto, Pipeline has been a member of Crossroads Live, LLC.

2

5.      Plaintiff Michael Edmondson resides in in Kansas City, Missouri. At all times relevant hereto, Edmondson has been a member of Crossroads Live, LLC.

6.      Plaintiff Brett Mosiman, the owner of Pipeline, resides in Lawrence, Kansas.

7.      Plaintiff PLT, LLC ("Ticketing") is a Kansas limited liability corporation with its principal place of business in Lawrence, Kansas. At all times relevant hereto, Ticketing has provided ticketing services for the Company. Mosiman is Ticketing's sole member.

8.      Plaintiff Midwest Production Services, LLC ("MPS") is a Kansas limited liability company with its principal place of business in Lawrence, Kansas. At all times relevant hereto, MPS has provided production services for the Company. Mosiman is MPS' majority member, although Nate Prenger maintains a less than 1% interest in MPS.

9.      Defendant S&A Pizza, Inc. ("S&A) is a Missouri corporation with its principal place of business in Kansas City, Missouri. At all times relevant hereto, S&A has been a member of Crossroads Live, LLC.

10.     Defendant Jeffrey "Stretch" Rumaner, the president of S&A, resides in Mission, Kansas.

11.     Defendant Crossroads Live, LLC ("Company") is a Missouri limited liability company with its principal place of business in Kansas City, Missouri. Crossroads Live, LLC operated the venue ("Venue") located at 417 E. 18th Street, Kansas City, Missouri 64108 that is now known as GrindersKC.

12.     Defendant Mammoth, Inc. is a Kansas corporation with its principal place of business in Lawrence, Kansas.

13.     Defendant Josh Fortier, a principal of Mammoth, resides in Kansas City, Missouri.

14.     Defendant Josh Hunt, a principal of Mammoth, lives in Lawrence, Kansas.

15.     Defendant Jacki Becker, a principal of Up to Eleven Productions and current general manager of GrindersKC, lives in Lawrence, Kansas. At all times relevant hereto, Becker was working on behalf of and as an agent of Mammoth.

16.     Defendant Up to Eleven Productions ("Eleven") is located in Lawrence, Kansas. At all times relevant hereto, Eleven was working on behalf of and as an agent of Mammoth.

## JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction (28 U.S.C. § 1331) over Counts XI, and XII of this Amended Complaint, which are claims brought under the Lanham Act, 15 U.S.C., § 1501, *et seq*.

18.     The Court has supplemental jurisdiction (28 U.S.C. § 1367) over the remaining Counts of this Complaint because those claims relate to the Counts over which the Court has original federal question jurisdiction.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and/or omissions giving rise to the claims took place occurred within this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district. Further, the Operating Agreement of the Company, described below, provides that the members consent to jurisdiction and venue in any state or federal court sitting in Jackson County, Missouri.

## GENERAL ALLEGATIONS

**The Creation of CrossroadsKC, the obligations of its members, and its successful track record**

20.     Pipeline has a 31-year track record of producing and operating musical events.

4

21.     In or around 2006, Mosiman, the owner of Pipeline, and Edmondson, an investor, were looking to create a unique live music experience in downtown Kansas City in a festive and enjoyable outdoor environment.

22.     S&A and Rumaner own property located at 417 E. 18th Street, Kansas City, Missouri 64108, which includes a 30,000 square foot lot ("Property").

23.     Neither S&A, nor Rumaner had any experience producing or operating national and/or ticketed musical events, but they leased the Property to the Company.

24.     Pipeline, Edmondson and S&A started CrossroadsKC, an outdoor music venue/ business on the Property in 2007.

25.     On or about April 21, 2008, Mosiman, on behalf of Pipeline, Edmondson, and Rumaner, on behalf of S&A, entered into an Operating Agreement for the Company, a copy of which is attached hereto as Exhibit 1 and incorporated herein by reference.

26.     At all times relevant hereto, the Company has been in the business of producing and operating musical events at the Property.

27.     Pipeline, Edmondson and S&A were members of the Company with the following ownership interest:

        a.      Edmondson – 14.3%;

        b.      Pipeline - 34.7%; and

        c.      S&A – 51%.

28.     Management of the Company was vested in the members, who designated S&A as the administrative member, which supervised, managed and controlled day-to-day operations.

29.     The Operating Agreement provided only upside for S&A and Rumaner. Specifically:

a.      Pipeline and Edmondson initially contributed tenant improvements valued at approximately $550,000, while S&A and Rumaner contributed little to no money;

b.      S&A was not obligated to contribute additional capital to the Company to pay or reimburse the Company for any expense which exceeded operating proceeds; and

c.      S&A's obligation to contribute required funds for the purpose of making improvements to the Property (other than tenant improvements) was paid only from operating proceeds. If there were not operating proceeds in an amount sufficient to satisfy S&A's percentage share, Pipeline was responsible for contributing the required funds to be reimbursed as operating proceeds were available.

30.      Rumaner's assistant, Thom Walker, confirmed through a July 13, 2015, 12:43 PM e-mail that "[Rumaner] has validated that his agreement with [Edmondson] and [Mosiman] was NO cash out of pocket."

31.      Although neither S&A, nor Rumaner put much, if any money into the Company for build out or ordinary losses, Pipeline and Edmondson honored this one-sided Operating Agreement throughout their joint venture. They made every improvement and upgrade and covered every bill and shortfall out of their own pocket.

32.      The members agreed that all personal expenditures and investments were to be repaid before profits were distributed. Specifically, the Operating Agreement provided that:

a.      Member loans were "cash-flow" loans payable as rapidly as possible, but solely out of operating proceeds (before distributions to members); and

6

b. No operating proceeds were to be distributed until all member loans were repaid in full.

33. Mosiman, on behalf of Pipeline, and Edmondson personally invested approximately $900,000 into the Company. They initially invested and/or borrowed approximately $550,000 to open the venue/business. And, over the course of the next 13 years, they put in approximately $350,000 more for improvements and to cover operating losses.

34. As of the fall of 2019, Pipeline and Edmondson were still owed approximately $300,000 for their investments and loans.

35. The Operating Agreement permitted the Company to enter into transactions or agreements with members or affiliates of members to provide leasing, management and other services on market terms. Accordingly:

a. The Company leased the Property from S&A for rent and utilities of approximately $6,000 per month;

b. Subject to S&A's supervision, management and control, Pipeline was responsible for planning, promoting and operating event productions, including signing acts, renting and installing equipment, security, sale of merchandise, and labor for installation and operation of the power, lighting and sound systems;

c. The Company engaged Ticketing, one of Mosiman's companies, to print and sell tickets as prescribed by the Operating Agreement;

d. S&A operated a drink window from Grinder's, a neighboring bar and restaurant it owned, on a rent-free basis at Company events without sharing revenues or expenses; and

7

e.   Grinder's remained opened to customers during Company events (provided beverage pricing was equivalent at Grinder's as pricing in Company bars).

36.   Upon information and belief, Grinder's most profitable weeks occurred when the Company was putting on musical events at the Property.

37.   Mosiman, on behalf of Pipeline, managed operations of the Company (including booking, marketing, production, security, bar operations, staffing, payroll, accounts payable, and sponsorships), subject to S&A's supervision, managed and control.

38.   Although Pipeline often delayed charging the Company for Mosiman's services to help grow the business, the Company paid Pipeline an average of approximately $70,000 per year in salary and commission on sponsorship sales over the past 5 years.

39.   As of the fall of 2019, Pipeline and Mosiman were still owed in excess of $100,000 in unpaid salary, commission and reimbursable expenses for overhead and staffing.

40.   In addition to engaging Ticketing, the Company also engaged MPS to provide production services as prescribed by the Operating Agreement.

41.   Both engagements were made on preferential terms for the Company, using rates significantly lower than industry standards for the benefit of the Company.

42.   In the last 5 years, the Crossroads work constituted approximately 80-90% of these companies' revenues and profits. Ticketing averaged approximately $2,000,000 in sales and approximately $75,000 in profit per year, while MPS averaged approximately 50 shows per year at $2,500 per show.

43.   For 13 seasons, CrossroadsKC has hosted approximately 40-50 shows per year featuring a diverse array of musical groups, from rock to reggae and bluegrass to hip hop.

8

44. Bands such as 311, Elvis Costello, Wilco, and Bone Thugs n' Harmony, return to play the venue on a regular basis.

45. CrossroadsKC has also won awards and been voted the best live music venue in Kansas City by several publications.

46. Fans regularly give CrossroadsKC high marks on social media sites such as Yelp and Facebook as an entertainment venue.

47. Further, the Company was paying its debt service and was profitable more often than not even though it only operated 40-50 days per year despite the fact that Rumaner and S&A Pizza continually and greatly limited the Company's ability to generate sales on non-show days.

48. Rumaner and S&A Pizza had full access to the Property on non-show days, despite that it was the Company who paid rent for that Property. Additionally, Rumaner and S&A Pizza were able to schedule holds on the Company calendar for Grinder's events and limited the Company's ability to generate sales during those times.

49. Rent was paid in full for approximately 150 straight months.

50. And despite hosting more than a million fans during this time, the Company never received a liquor violation.

51. For 13 seasons, the Company paid S&A approximately $72,000 per year in rent and utilities. Upon information and belief, S&A additionally made approximately $100,000 per year selling liquor from the back window of Grinder's, and Company events brought hundreds of thousands of customers to Grinder's.

52. For 13 seasons, the Company paid Pipeline for Mr. Mosiman's services; Pipeline retained sponsorship commissions; and Pipeline Ticketing retained the service charge from ticket sales (of which they had to pay the credit card discount rate, the licensing fee for

9

the ticketing software, and overhead), and the ticket price, facility fee and sales tax went to the Company, all pursuant to industry standard.

53.     For 13 seasons, S&A, as administrative member, supervised, managed, and controlled all business filings, tax reports and other necessary legal documents on behalf of the Company, and until the events set forth below, never complained that:

      a.      Pipeline or Mosiman ran the Company poorly;

      b.      There were any material "problems" or "irregularities";

      c.      The Company paid Pipeline for Mosiman's services;

      d.      Pipeline retained sponsorship commissions; or

      e.      Ticketing retained the service charge from ticket sales.

**Rumaner's theft of the Venue and the attempted dissolution of the Company**

54.     Everything changed in the summer of 2019 after Rumaner's core business, Grinder's, was collapsing. New units in Leavenworth and Lawrence experienced massive losses, and both closed. Rumaner's new coffee house, Chance's, was also failing. Further, reviews on social media platforms like Facebook, Reddit and Yelp were criticizing Grinder's reputation for service and food quality, as well as Rumaner's character.

55.     As Rumaner's problems increased, he decided to steal the one good business that he was associated with, CrossroadsKC, even though members Pipeline and Edmondson had envisioned, created, and paid for it.

56.     On or about August 20, 2019, after Rumaner had begun making false allegations about Pipeline, Mosiman emailed him and Edmondson suggesting that the three members initiate the informal dispute resolution procedures set forth in the Operating Agreement, which was unsuccessful.

57.     In or around September 2019, Rumaner informed Mosiman and Edmondson that he was taking over the Company, claiming that it was poorly managed and mishandled.

58.     On or about September 29, 2019, Mosiman wrote an email to Rumaner disputing his allegations and asking him to put in writing exactly what he was planning or proposing with respect to the ownership, operation and/or dissolution of the Company.

59.     Rumaner refused to answer Mosiman's question.

60.     On or about October 8, 2019, Mosiman followed up with Rumaner via email, again requesting his written plan of action for how he planned to proceed with CrossroadsKC and/or wind down the Company.

61.     Rumaner against refused to answer Mosiman's question.

62.     On or about October 22, 2019, the day after CrossroadKC's last show of the season, Rumaner changed the locks and codes at the venue and prevented Pipeline, Edmondson and Mosiman from entering.

63.     In response, Mosiman sent an email to Rumaner resigning from management since Rumaner had seized the assets of the Company and unilaterally precluded the Company from honoring, and Pipeline and Edmondson from recouping, their investments, debts and loans as prescribed in the Operating Agreement, all for Rumaner's own personal gain in total contradiction of the best interests of the Company, its members, employees and staff.

64.     At all times since October 22, 2019, S&A and Rumaner have constructively expelled Pipeline and Edmondson as members of the Company.

65.     Further, S&A and Rumaner have unilaterally and wrongfully barred Pipeline, Mosiman and Edmondson from the Property.

66. On or about October 24, 2019, Mosiman emailed Rumaner that seizing the assets of the Company was in violation of the Operating Agreement, was neither fair, nor equitable, and would likely cause significant damage to the Company, the members, and Pipeline's related entities like Ticketing and MPS.

67. On November 1, 2019, Mosiman emailed Rumaner warning that his actions would cause him to lose all revenue and income from CrossroadsKC, Ticketing and MPS, and all those companies (and employees) were in jeopardy because of the closing. He also reminded Rumaner that both he and Edmondson carried significant debt on the project.

68. On or about November 14, 2019, S&A, through Rumaner, sent the Company, Edmondson, and Pipeline, through Mosiman, a letter terminating the lease to the Property without providing any explanation, let alone good cause.

69. On or about November 19, 2019, S&A, through Rumaner, sent Edmondson and Pipeline written notice purporting to cancel the business of the Company without providing any explanation, let alone good cause, other than absurdly stating that it was because of some unidentified actions of Mosiman and/or Pipeline. While S&A and Rumaner spoke of cancelling the business, their actual intention was to steal the business and continue its operation themselves.

70. Neither S&A, nor Rumaner has offered any compensation to Pipeline, Edmondson or Mosiman for their aggressive, improper and highly detrimental "takeover" act.

71. Again, Rumaner did not take these actions so S&A could get out of the business. Rather, he took them to produce and operate musical events at the same venue, using the same name, brand, and improvements paid for by Pipeline and Edmondson, for his own personal profit.

12

**The involvement of Mammoth, Fortier, Hunt, Becker, and Eleven**

72.     Moreover, from mid-summer to October 2019, before Rumaner changed the locks and codes to the venue, he conspired with Pipeline's competitors, Mammoth, Mammoth's principals Fortier and Hunt, along with Becker and Eleven, to replace Pipeline and manage operations of the Company.

73.     Mammoth is an event production company based out of Lawrence, Kansas that produces concerts and live events in the Midwest. Mammoth also has offices in Kansas City, Missouri.

74.     As early as 2014, Mammoth attempted to oust Pipeline Productions as the promoter associated with the Company. On October 21, 2014, Fortier sent Rumaner a proposed facility license agreement for the 2015 calendar year, with the option of renewal for two successive one year terms. This greatly different from the normal facility license agreements that Mammoth and Mosiman entered into, which only allowed Mammoth access to the Venue for a period of up to 36 hours. To Plaintiffs' knowledge, this proposed agreement was never signed.

75.     Jacki Becker is the principal of Eleven. Becker and Eleven purported to be independent contractors, working with Mammoth to help book shows for the Venue after Pipeline was expelled from the Company. Becker was named general manager of the Venue, now known as GrindersKC. At all times, Becker and Eleven were working on behalf of and as employees/agents of Mammoth. Mammoth authorized Becker and Eleven's conduct, and Eleven further authorized Becker's conduct.

76.     At all times relevant hereto, Mammoth, Fortier, Hunt, Becker, and Eleven have been engaged in substantially the same business as Pipeline. In other words, Mammoth, Fortier, Hunt, Becker, and Eleven are direct competitors of Pipeline and CrossroadsKC. In fact, Mosiman

13

has told Rumaner numerous times that Mammoth was a competitor of Pipeline and Rumaner was fully aware of Mammoth and Pipeline's adversarial relationship.

77.     As evidenced by law firm invoices (improperly) issued to the Company, Rumaner was seeking legal counsel about breaching the Operating Agreement and lease in late July, August and September 2019.

78.     Despite S&A receiving approximately $72,000 per year in rent, $100,000 per year selling liquor from the back window of Grinder's, and having hundreds of thousands of customers flock to Grinder's, S&A and Rumaner entered into an agreement with Mammoth, Fortier, Hunt, Becker, and Eleven to oust Pipeline, Edmondson and Mosiman so they could run the venue and maintain the venue as CrossroadsKC or CrossroadsKC@Grinders.

79.     In July 2019, Fortier recommended that his accountant take a look at the Company's finances, and Rumaner sent the Company's finances to Fortier's accountant.

80.     On August 11, 2019, Fortier sent Mammoth's general counsel, Jade Brown, proposed points to include on a draft Venue Agreement for the Venue. The initial points included that Mammoth and Mosiman would have a "co exclusive" on the Venue, but after a conversation with Hunt, Brown informed Fortier that Pipeline was removed and replaced with standard exclusivity language.

81.     Mammoth obtaining exclusivity at the Venue mirrors the exclusivity that they obtained at venues all throughout Kansas City. Mammoth has exclusivity at GrindersKC, Liberty Hall, Granada, The Madrid, Bottleneck, Uptown, and used to have exclusivity at the Beaumont Club before it closed. Mammoth does this with the purpose of preventing fair competition and removing competitors from the industry.

82.     On August 23, 2019, Fortier sent Rumaner a first draft of the Crossroads Venue Agreement.

83.     Upon information and belief, Fortier and Rumaner had been discussing Mammoth taking over the Venue long before August 2019.

84.     On August 31, 2019, Fortier e-mailed Mosiman about 2020 holds for a band called Primus, who Mammoth and Pipeline typically produced via co-production or "co-pro." Mosiman gave Fortier a hold without knowing that Fortier, Rumaner, Hunt, Becker, and Eleven were planning on ousting Mosiman from the Company and that he was essentially helping his competitors schedule shows at the Venue.

**Mammoth's improper use of CrossroadsKC intellectual property**

85.     On that same day, Fortier e-mail an agent with an offer for Primus to play at "CrossroadsKC," even though Fortier knew, or should have known, that CrossroadsKC was the d/b/a of the Company, which should have wound down after Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven conspired to oust Mosiman and the Company.

86.     On October 11, 2019, prior to the Company's 2019 concert season concluding, Fortier e-mailed an agent with an offer for Cake to play at "CrossroadsKC" in 2020. Mosiman was not consulted about this offer and was unaware of the same. Fortier was planning out the 2020 calendar at the venue prior to Mosiman's expulsion.

87.     On October 31, 2019, Fortier e-mailed Hunt and brought up Mosiman and Edmondson's loan. The next day, Hunt responded that Mosiman and Edmondson's loan was not their problem.

88.     On November 4, 2019, Becker e-mailed Fortier and Hunt about being the general manager for the Venue. Her Event Manager Deal Memo refers to the facility as "Crossroads KC" and gave her exclusive control of the events calendar and the booking and scheduling of all events.

89.     On November 18, 2019, Hunt and Fortier received an agreement from E-Tix for "Crossroads and Mammoth." E-Tix was the previous vendor for the Company prior to the Company's expulsion from the Venue.

90.     On November 19, 2019, Fortier sent Hunt and Becker a list of 2020 offers for bands to perform at the Venue. Those offers included Slightly Stoopid, Wiz Khalifa, Primus, Run the Jewels, Wu Tang, Ke$ha, the Revivalists, Cake, Of Monsters and of Men, Ziggy Marley, and the Dirty Heads. All of these offers were made using the CrossroadsKC name.

91.     Other offers for the 2020 calendar that used the CrossroadsKC name were The Decemberists, Three 6 Mafia, Ganja White Night, RL Grime, Leon Bridges, Grace Potter, Rancid/Dropkick Murphy's, Nathaniel Rateliff, Soundtribe/Lettuce, Louis the Child, Rufus del Sol, JAM 2020, Blink 182, Girl Talk, Adventure Club/Carnage, Toadies & Reverend Horton Heat, Modest Mouse, the Wailers, Dead South, Sheryl Crow, Khruangbin, and Guster. All of these offers were made by Mammoth, Fortier, Hunt, Becker, and Eleven, knowing that they had successfully stolen CrossroadsKC and had complete control going forward.

92.     Mammoth, Fortier, Hunt, Becker, and Eleven were using the CrossroadsKC name and goodwill to book shows after Pipeline was ousted from the Venue and CrossroadsKC should have wound down.

93.     On December 6, 2019, Fortier e-mailed an agent with Creative Artists Agency and said that "Brett has not settled with us for the Griz show at Crossroads… He has issues with the artist settlement and the fact we paid you what we did. He told me he had emotional issues with

16

the settlement. Although it's not your problem I wanted you to be aware. We are sending a demand letter next week. Please put him on the f\*\*k you list for us. Cheers. . ." (astericks not in original).

94.    This e-mail evinces an intent not only to take over the Venue, but also to get Mosiman and Pipeline blackballed from the industry and removed as a competitor.

95.    Also on December 6, 2019, when Becker asked Hunt what to tell Nathaniel Rateliff's agent "in regard to XRDS," Hunt responded to "tell him that we're gonna be doing the booking there now."

96.    On December 9, 2019, Fortier e-mailed Hunt with the subject line "Can you imagine the look on his [Brett's] face when he finds out Jacki is running…..! boom"

97.    On December 19, 2019, Becker e-mailed Fortier and Hunt that she "[r]eached out to an agent and he immediately asked how we are going to have Brett involved." She further asked for "thoughts on this as I begin to inquire on bands Brett has long relationships with."

98.    On January 16, 2020, Rumaner e-mailed Hunt, Fortier, Walker, Brown, and Becker and stated that if Mosiman "threatens [his] Businesses [he] will retaliate."

99.    On January 23, 2020, a Mammoth employee, Mickey Ortiz, e-mailed an agent for Rufus del Sol that Mammoth would "love to host this in the heart of the KC Art District at Crossroads KC."

100.    On January 24, 2020, Becker put a list together of bands booked regularly at Crossroads and noted which Mammoth employees had reached out to the band.

101.    The vast majority of the bands that Mammoth and Becker have since booked to perform the venue now known as GrindersKC are bands that Pipeline and Mosiman previously booked.

102.     On February 6, 2020, Becker sent an e-mail to an agent from the Atomic Music Group that "attached an offer for crossroads in Kansas City." She said that "we are taking over the calendar at the space." The agent responded that "I already have holds with Brett on these dates???" before further inquiring, "what do you mean by taking over the calendar at Crossroads? Are you saying Brett Mosiman is no longer doing it?"

103.     Once Mosiman learned that Mammoth, Fortier, and Hunt or someone on their behalf (he was unaware of the extent of Becker and Eleven's involvement at the time), was trying to steal assets and brand identities of CrossroadsKC from Pipeline, he warned them via email that S&A and Rumaner did not have legal claim to the CrossroadsKC name, brand, trademark, intellectual property, social media platforms, website and domain, or customer database.

104.     Mosiman further demanded that Mammoth, Fortier, and Hunt cease use of CrossroadsKC and that any equitable division of the CrossroadsKC assets would leave Pipeline with all intellectual property and brand identity.

105.     This letter was further prompted by Mammoth, Fortier, Hunt, Becker, and Eleven beginning to promote shows at the Venue, using the CrossroadsKC name, logo, and intellectual property.

106.     On February 10, 2020, Becker suggested that Mammoth use the name "Crossroads KC at grinders for this year" and then next year, "we can think about a rebrand, but. . . we will be able to be the ones who retain the space, the name, and all the info/ marketing that comes with it." Becker further wondered "when these shows get announced tomorrow how are people going to know it's the same space? not a different venue?" Lastly, she wrote that "i feel crossroadskc at grinders is the smartest best name to keep people understanding it's our venue and its at grinders."

107.     Recognizing the brand impact of Crossroads, Becker e-mailed Hunt and Fortier that "i assumed we are sticking with CROSSROADS also. or CROSSROADS at grinders but making at grinders much smaller."

108.     Hunt had previously stated that he wanted to keep Crossroads in the name because "[t]he closer we keep it to the name people know the space by, the easier that will be to combat."

109.     On February 11, 2020, Becker e-mailed the Mammoth staff that "moving forward crossroads will be known as GRINDERS CROSSROADS." However, the day prior, Becker recognized that "people are going to be so confused tomorrow when stuff gets announced and grinders is first. i always thought if we were doing grinders is [sic] would be crossroads at grinders. we have 0 access to emails, we have 0 access to all the crossroads socials and we are going with it to say GRINDERS CROSSROADS i just think no one is going to know what the heck is up."

110.     Also on February 11, 2020, Becker asked if Mammoth could add the tagline "grinders crossroads: live music outdoors since 2004," even though the venue then known as Grinders Crossroads, now known as GrindersKC, had never put on a single show.

111.     The confusion this caused was evident immediately, as Becker told an agent with Paradigm Agency that Jamey Johnson was confirmed for Grinders Crossroads and the agent responded, "This is just normal crossroads right? First I'm seeing Grinders." Fortier told the agent, "yes… name is changed back to the old name."

112.     Mammoth, Fortier, Hunt, Becker, and Eleven continued to harness the Company's reputation. For example, when booking Sheryl Crow, Crow's agent declined Fortier's offer of a different venue and specifically stated she wants Crossroads, to which Fortier responded that he understood.

113.    From the summer of 2019 to the spring of 2020, Mammoth, Fortier, Hunt, Becker, and Eleven consistently represented that CrossroadsKC still existed and attempted to commandeer, often successfully, its history, its trade secrets and proprietary information, its relationships with bands, agents, and fans, and its reputation.

**The theft of Pipeline's confidential and proprietary information**

114.    By virtue of S&A's membership in the Company, Rumaner had access to and was privy to Pipeline's confidential and proprietary business information, including, but not limited to, Pipeline and Ticketing's pricing, service capabilities, sales and marketing plans, business strategies and other trade secrets.

115.    By virtue of S&A's membership in the Company, Rumaner was provided access to Pipeline's highly proprietary business information. At no time was Rumaner authorized to use or access any of the information for any purpose other than in the direct performance of his duties as administrative member of the Company for the benefit of the Company.

116.    Upon information and belief, during at least a several month period leading up to October 22, 2019, before Rumaner locked Pipeline and Edmondson out of the Company out and while S&A was still the administrative member of the Company (and still receiving rent, money from liquor sales, etc.), Rumaner secretly began competing with the Company and Pipeline and intentionally diverted business away from them to his soon-to-be new venture with Mammoth, Fortier, Hunt, Becker, and Eleven.

117.    Subsequently, Rumaner began contacting Pipeline's customers, employees and vendors and diverting business away from the Company and Pipeline to Mammoth, Fortier, Hunt, Becker, and Eleven, all while using the name, logo, marks and corporate assets of the Company that Pipeline had created, owned and controlled.

118.     While Rumaner was diverting the Company's and Pipeline's business, clients and prospects away to his new venture, Mammoth, Fortier, Hunt, Becker, and Eleven knew or should have known that Rumaner, through S&A, was the administrative member of the Company and Pipeline and Edmondson were members.

119.     Upon information and belief, employees, agents, officers or directors of Mammoth, including Fortier, Hunt, Becker, and/or Eleven, directly conspired with, actively worked with and encouraged S&A and Rumaner to divert the Company's and Pipeline's business, artists, clients, prospects, confidential and proprietary information, data and trade secrets away from them and to their new venture.

120.     Upon information and belief, S&A and Rumaner, acting in concert with Mammoth, Fortier, Hunt, Becker, Eleven, and others (who were at all times acting on behalf of Mammoth or the new venture) were successful in procuring business for them from the Company's and Pipeline's artists, clients, vendors and sponsors (while still the administrative member of the Company).

121.     On November 13, 2019, Rumaner's assistant Walker said that he "was able to intercept the attached DRAFT 'P&L By Class 2018' breaking out sales and expenses for every show 2018 – from the point of view of the venue (not production costs, no ticketing surplus, sponsorships, etc.) This should show you a good distribution of liquor and ticket revenue on a per show basis." Walker attached the referenced spreadsheet and sent it to Fortier and Hunt. Neither Rumaner nor Walker were authorized to share this information with anyone, especially not Pipeline's direct competitors.

122.     On November 26, 2019, Becker sent an e-mail to Fortier and Hunt that Rumaner had sent her their last five years of shows. Becker and Eleven made a list of acts that had performed at least two of the years and asked which bands Mammoth should offer and bring back.

123.     On December 5, 2019, Walker, on behalf of S&A and from Rumaner's e-mail account, forwarded Becker, Fortier, and Hunt an e-mail authored by Mosiman that attached numerous past draft sponsorship agreements that the Company or Pipeline entered into with various sponsors, including Coca-Cola, Deep Eddy, McCormick, Central States, Red Bull, and T-Mobile.

124.     On January 6, 2020, Hunt e-mailed Walker and Rumaner that Carman Stalker, who runs sponsorships for Mammoth, "will be working to make contact and retain the existing sponsors from Crossroads." Hunt further asked Walker and Rumaner if "you can provide all of the pertinent historical sponsorship details and contact info so [Stalker] can reach out well equipped."

125.     On March 18, 2020, Stalker sent a sponsorship agreement on behalf of Mammoth to Central States and Beverage Company. This sponsorship agreement largely mirrored the previous sponsorship agreements between Central States and Pipeline that Mosiman had drafted.

126.     On January 17, 2020, an agent reached to Hunt for tech specs, and Hunt sent the agent a document created by Pipeline called "CrossroadsKC- Venue Technical Information-2019," with a large "CrossroadsKC at Grinders" logo at the top.

**Mammoth and Becker's attempt to access the CrossroadsKC social media**

127.     S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven made numerous attempts to access the Company website and social media pages, which were owned and controlled by Pipeline, and grew increasingly frustrated as those attempts failed.

22

128. On February 7, 2020, Becker stated that she was "still working on gaining access [to] emails / names to facebook / IG and twitter too."

129. On February 8, 2020, Becker e-mailed Fortier, Hunt, Rumaner, and Walker:

> i have spent the past week trying to gain access to the crossroadskc, facebook / instagram / twitter accounts. ive reached out to his past marketing people from last year, and people who have worked for him over the past decade. anyone who has worked for brett recently will not give me access to these accounts, and people who were let go by him who i thought might be able to track it down none of them could work their way in. apparently brett holds the password and email and sends them to whoever he feels should have access.

130. Rumaner confirmed that Mosiman never shared with him the username or password to the CrossroadsKC social media accounts.

131. Becker attempted to get the information for the social media accounts from Billy Papa, Pipeline's tech specialist. On January 13, 2020, Becker indicated she was going to ask a waitress/bartender at a drinking establishment that Papa frequents to text Becker when Papa showed up to drink.

132. Becker's attempts to get information from Papa while he was intoxicated apparently failed, as she told Rumaner, Walker, Hunt and Fortier on a February 7, 2020 e-mail that she was unable to get social media access through Papa.

133. Becker then suggested contacting Lyndsey McElderry, Pipeline's Director of Marketing and Ticketing. On February 7, 2020, Becker stated that she was trying to get McElderry to turn over Facebook, Instagram, Snapchat, and Twitter. McElderry told Becker she would not give her that information.

134. Becker stated that she would next "reach out to each of these platforms and appeal that we are the new people running these pages."

135.     On February 10, 2020, Mosiman was notified by Papa that someone had attempted to access Pipeline's Snapchat, Instagram, and Twitter account. Papa was able to identify that the person attempting to access the Instagram account was using the e-mail address xrds.kc@gmail.com and that they were connecting from East Lawrence, where Mammoth's office is located.

136.     In fact, Mammoth, Fortier, Hunt, Becker, and Eleven intentionally and illegally attempted to access, and did access, CrossroadsKC social media (owned and controlled by Pipeline) without authorization and using passwords that they had secretly obtained.

137.     On February 10, 2020 at 1:37 PM, Fortier received a text message from Austin Mam (presumably someone named Austin that works at Mammoth) that said, "hey guys so my friend that worked for crossroads has login access to socials but is asking if brett knows you're going to be posting on crossroads before giving them to be cuz she doesn't want to get in trouble. what should i say?"

138.     At 2:43 PM that day, "Austin" texted Fortier and Hunt that "i got access to all the socials besides fb" and texted Fortier and Hunt a screenshot of the Usernames and Passwords to the CrossroadsKC Instagram, Twitter, and Snapchat account. The screenshot did not include the username or password for the Facebook account, but "Austin" suggested talking to Papa to get access to the Facebook account.

139.     Fortier and/or Hunt intentionally and illegally provided the screenshot to Ryan Loecker, a Mammoth employee, who then attempted, and did, take unauthorized control CrossroadsKC's Snapchat, Instagram, and Twitter accounts, which were owned and controlled by Pipeline.

24

140. At 4:37 PM, Loecker e-mailed Fortier and Hunt to say, "We have an issue. I changed the info, but they changed the Instagram back. They must have still been logged in on their phone and changed the password back before it logged them out. Now I can't get back in. Twitter is still ours." He then wrote Becker, "any luck with Facebook? I took over Twitter and Instagram, but they took Instagram back… We need to be added as admins on Facebook & get the new Instagram password, or start fresh it sounds like."

141. Once Pipeline was able to secure the CrossroadsKC Twitter account that it owned and controlled, Loecker wrote: "Aaaand they took back Twitter as well. So frustrating. I listed my phone number for the account, changed the e-mail, clicked log out of all. They must have gotten notified when I logged in and clicked 'this isn't me.'"

142. Becker responded and said "shit that sucks, because that means someone in brett world knows what we are up to. i am trying with facebook but its very tricky."

143. Loecker responded to Becker and said, "I know, sucks. I thought I had it secured, but they must've received an e-mail and been able to revert it as a security measure."

144. After Mosiman discovered Mammoth' attempts to access Pipeline's social media accounts (Mosiman did not know about Becker's involvement at the time), Mosiman demanded that Mammoth, Fortier, Hunt, S&A and Rumaner immediately cease and desist from using anything referencing CrossroadsKC, benefitting directly from CrossroadsKC's brand, likeness and/or digital platforms, attempting to fraudulently represent that they have legal claim to the platforms, or in any way representing through artist offers or event on sales to the public that they were purchasing a ticket to a CrossroadsKC event.

145. Mammoth, Fortier, Hunt, S&A and Rumaner continued to use the CrossroadsKC name and likeness, even after Mosiman sent the cease-and-desist, as did Becker and Eleven.

25

**Mammoth and Becker's attempts to access the CrossroadsKC website**

146.     Fortier, Hunt, and Becker had similar problems attempting to access and control CrossroadsKC's website, which was owned and controlled by Pipeline.

147.     In a February 6, 2020 e-mail, Mammoth recognized that Pipeline has "the passwords and info to control [the] venue website."

148.     On February 14, 2020, Becker e-mailed Hunt and Fortier that she had attempted to get Nate Prenger, Mosiman's former partner who sabotaged their operations, to sign over www.crossroadskc.com to Mammoth. Becker wanted to get that site shut down and redirect to grinderscrossroads while Mosiman was busy with a jury trial and would be unable to quickly react.

149.     On February 18, 2020, Becker e-mailed Rumaner, Walker, Fortier, and Hunt, "it appears we still don't own crossroadskc yet? is that correct stretch?... we need a functioning website last week, so josh and i opted to purchase grinderscrossroads.com and have shows up and running there… ideally i am hoping we can get crossroadskc and redirect to grinderscrossroads so that will help people knowing exactly who we are."

150.     Becker further asked "is there anything else we can do with nate to get this transferred over soon than later?"

151.     When Mammoth and Becker were unable to get access to CrossroadsKC.com and had to create a new website, they attempted to use that new website to steal the history and past productions of CrossroadsKC and pass them off as their own.

152.     On February 13, 2020, Hunt e-mailed Rumaner, Walker, Becker and Fortier: "can we get a list of all previous shows at the venue sorted by date? We'd like these on new socials, websites in addition to 'live music outdoors since 2004'. Its all part of making sure that the venue's legacy and identity don't get hi-jacked by whatever new space is coming to the neighborhood."

26

153.    Walker indicated he would probably have a list of shows dating back to 2012, and Becker said that she would "check with some former Brett employees who worked there maybe they have something from the early years on a database."

154.    Sometime prior to February 11, 2020, Stalker pulled all the old photos from the CrossroadsKC website, which was owned and controlled by Pipeline. He e-mailed Becker and the Mammoth staff, "I pulled everything from the old website a few weeks back. The folder below contains images and the docs are the text from the website."

155.    Becker forwarded these to their website designer on February 13, 2020, telling him her belief that since Rumaner owns the venue, any venue pictures were theirs to use.

156.    The website designer indicated that he would "add an archived show tab to an archived show page, and put a comments and social like share on it so that people can comment on old shows they've missed, or even share and tag people in them."

157.    Mammoth has also attempted to get photos for their website and advertisements by screenshotting old posters from the CrossroadsKC Instagram, which was owned and controlled by Pipeline. On February 23, 2020, Becker e-mailed the website designer that, although CrossroadsKC was managed by Pipeline, "we can screen shot and post this [sic] photos because stretch still one of the owners." Hunt agreed, "use images of the posters not the posts."

**Mammoth and Becker's illegal and defamatory attempts to seize Pipeline's customer database**

158.    Mammoth, Fortier, Hunt, Becker, and Eleven also attempted to steal Pipeline's e-mail list of customers who had previously bought tickets at CrossroadsKC. This customer database and e-mail list is one of Pipeline's most valuable trade secrets.

159.    Becker recognized that the e-mail list was Pipeline's in an e-mail to Fortier and Hunt dated February 6, 2020. "[I]n regard to the email list, that technically isn't our property, it

27

was pipeline. i am working on trying to get the shows i booked at crossroads buyers list if possible, but right now no one is willing to assist with this."

160.    On February 4, 2020, an employee for Mammoth, Matt Camden, e-mailed E-Tix and told them, "this venue already exists in the eTix system, would it make sense to just build upon our existing profile so that we don't have to resubmit a bunch of duplicates."

161.    On February 6, 2020, a Mammoth employee, Casey Hunt, e-mailed Stalker, Hunt, and Fortier that Mammoth is "looking for ticket purchase data in order to build a sponsorship outline/sheet for Crossroads," but that they are in a situation where "Pipeline is the point of contact for access to this past purchasing info."

162.    Once Mammoth and Becker realized that Pipeline had the sole access to the e-mail list, they attempted to get the past ticket information from E-Tix by misrepresenting the venue's history and defaming Mosiman in the process.

163.    On February 7, 2020, Hunt asked Becker to "send me a letter requesting existing data from e-tix. Maybe send it from the perspective of Brett being in default and defrauding the business?"

164.    That same day, Rumaner told Becker to write the letter and that he would send it over to E-Tix immediately.

165.    Hunt gave Becker suggestions on what to put in the letter, including that:

    a.    "Stretch owns and built Crossroads from scratch.. developed the neighborhood, etc. Establish that he is the guy who should've had the ticketing agreement without stating that.

    b.    "Brett was a concert partner who was supposed to be sharing all revenue and information but cut side deals and was anything but transparent."

28

c. "Overtime Brett defrauded the business for hundreds of thousands of dollars."

d. "Brett was removed from the partnership for his immoral business practices and hiding revenue for 15 years."

e. "Stretch felt compelled to honor the E-tix arrangement of being our ticket provider even though he had no contractual obligation and we had offers for more money elsewhere."

166. Hunt indicated this letter was their only shot at getting the e-mail list, admitting "[t]here is no legal basis, we need [E-Tix] to break their policy and give us data that they own equally with Brett and probably have the right to give us if they so choose."

167. On February 11, 2020, Becker authored a draft of the E-Tix letter and sent it to Hunt, Walker, and Rumaner. Becker introduced the letter by stating "here is the revised letter i wrote for you in our attempt to gain access to the emails of our crossroads purchasers."

168. The letter otherwise incorporated Hunt's suggestions that she accuse Mosiman of fraud and immoral business practices.

169. In writing this first draft, Becker specifically asked whether anyone thought this was defamation of character.

170. On February 11, 2020, Rumaner stated that he was "good" with the letter, so long as she removed the part about Mosiman defrauding the business for hundreds of thousands of dollars. Fortier similarly approved of the letter.

171. On February 19, 2020, Hunt sent the letter via e-mail to Shannon Schlappi of E-Tix. The final letter read as follows:

Twenty years ago, STRETCH bought a dilapidated block in downtown Kansas City. Over time he developed this block into a series of highly successful restaurants and a thriving live music venue known as the Crossroads. This space, attached to Grinders Restaurants, has become a nationally recognized live music standard in downtown Kansas City.

29

Grinders & Crossroads anchor the Crossroads Arts District, an area that is now the nation's 4th Largest art market, which is booming with restaurants, breweries, distilleries, artists and art galleries in downtown KCMO.

To facilitate the process with booking, Grinders brought in a company called Pipeline Productions with Brett Mosiman as the primary promoter of the Crossroads music venue and as a minority partner in the ownership of our Crossroads business. Brett Mosiman was responsible for handling the booking for the venue. However, as time as [sic] passed, we have come to learn that he was not an honest partner. Since day one- he was supposed to be sharing in all revenue and information, but, over the years he created new entities, redirected funds, obfuscated the money trial, cut side deals and was anything but transparent with his partners.

Over the years Brett defrauded the partnership. In 2019 he was removed from our partnership for his immoral business practices and hiding revenue from our partnership for fifteen years – forcing us to mend many broken sponsorship, ticketing, and business relationships, as well as more than a few that he had created without our even knowing.
One of the side-deals he cut was moving ticketing from Ticketfly to ETix. Grinders Crossroads was given zero info of this change when it occurred. When Brett was removed from Crossroads, we learned that we were still under contract with E-Tix. Although we had offers from other ticketing companies for more money, we felt the honorable thing to do was to keep the contract with E-tix, and not do what Brett Mosiman had already done to us & Ticketfly.

With us keeping our contract with E-Tix, we have learned that Brett Mosiman will not allow us access to OUR account information, nor the emails of crossroads ticket purchasers. Even though we are the venue, he signed the contract without us knowing and kept a health cash advance via PLT, LLC, not shared with his partners as dictated by the operating agreement of the partnership entity.

In order for us to be able to move forward for our 2020 season, and get our promotions going to the highest levels we can, we need access to our purchaser's emails.

I am requesting on behalf of Grinders Crossroads, that Etix would be willing to share our purchaser's emails. We look forward to having a successful season with ETix at our venue, and hope to be able to sell the most tickets possible with YOUR assistance. Any reason why you couldn't share with us our purchasers emails addresses? Fans from all over the country come to OUR venue, regardless of any prior secret agreement you may have had with some out-of-state 3rd party. Will you please help?

Thank you for your time and understanding in this sensitive situation.

172.    The letter was signed by Thom Walker on behalf of Rumaner. The signature block further stated that CrossroadsKC was the DBA of S&A, which was not true. CrossroadsKC was the DBA of the Company.

173.    Almost the entirety of the letter was a blatant and defamatory fabrication in order for Mammoth and Becker to access an e-mail list that was not theirs and profit off of Pipeline and Mosiman's 13 years of hard work.

174.    On February 20, 2020, Shannon Schlappi at E-tix told Hunt, "I'll pass this on and see if it helps."

**Current developments**

175.    After Mosiman sent a cease and desist, S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, Eleven eventually changed their name to "Grinders Crossroads," which intentionally co-opted and confused the Company's brand.

176.    Following an injunction issued by this Court prevented them from using the word "Crossroads" in conjunction with the venue, S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven changed their name to "GrindersKC."

177.    The GrindersKC Facebook account says "GrindersKC Event Venue is KC's premier outdoor music & event venue downtown & won USA Today's #1 spot in its 10Best list for both Live Music & Night Life. Established in 2004 – Rocking Kansas City." However, GrindersKC has only existed for approximately a year. It has not been around for fifteen years, it was not established in 2004, and it did not win the USA Today's $1 spot in its 10Best list.

178.    The USA Today article (about CrossroadsKC, not GrindersKC), available at https://www.10best.com/destinations/ missouri/kansas-city/nightlife/live-music/, even references Pipeline Productions by name.

179.    The GrindersKC Twitter account, @grinders_KC, states "Live music outdoors in the crossroads district for fifteen years."

180.    GrindersKC has not been putting on live music outdoors in the crossroads district for fifteen years.

181.    A sign in the venue states, "GRINDERS KC, WHERE ART, FOOD & MUSIC COLLIDE. est. 2004."

182.    GrindersKC was not established in 2004.

183.    GrindersKC has now put on several shows, including Jamey Johnson, Stratgazer's Summer Jam, Bluegrass in the Bottoms, and Fitz and the Tantrums.

184.    Pursuant to the Operating Agreement, the Company, which has not yet been dissolved, is entitled to the proceeds of these shows, with 51% of the proceeds going to S&A Pizza, and 49% of the proceeds going to Pipeline and Edmondson.

185.    To this date, neither Pipeline nor Edmondson have not received any of the proceeds of these shows.

## COUNT I - BREACH OF CONTRACT
### (Plaintiffs v. S&A and Company)

186.    Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-185 above.

187.    The Operating Agreement of the Company constitutes a valid and enforceable contract under Missouri law.

188.    Pipeline and Edmondson have fully complied with their obligations under the Operating Agreement.

189.    Mosiman, Ticketing and MPS were third party beneficiaries to the contract.

190.    S&A and the Company breached the Operating Agreement as follows by:

a.    Locking Pipeline and Edmondson out of the venue without cause;

b.    Purporting to expel Pipeline and Edmondson as members without cause;

c.    Purporting to cancel the business without cause;

d.    Purporting to cancel the business without initiating the informal dispute resolution process prescribed in the Operating Agreement;

e.    Purporting to cancel the business without winding down;

f.    Refusing to negotiate an equitable plan for winding down;

g.    Continuing to carry on the business of the Company after the purported cancellation of the business;

h.    Failing to repay Pipeline and Edmondson for their loans to the Company for leasehold improvements and other items; and

i.    Refusing to pay Pipeline and Edmondson the value of their ownership interests, adequately split the Company's assets, or even allow Pipeline and Edmondson to take unattached improvements they paid for.

j.    Failing to pay Pipeline and Edmondson any proceeds of the shows currently playing at the Venue.

191.    As a direct result of the breach, Pipeline and Edmondson have suffered damages equal to the value of their membership interests on October 22, 2019, together with interest thereon through the date of judgment.

192.    As a direct result of the breach, Pipeline and Edmondson have not been repaid their approximately $300,000 in investments and loans to the Company.

193.    As a direct result of the breach, Pipeline has not been repaid the approximately $100,000 in unpaid salary, commission and expenses Mosiman is owed. Further, Mosiman has

lost the salary and commissions he was receiving - approximately $72,000 per year – and expected to continue to receive for at least 10 years based on the Company's 13-year track record.

194.    As a direct result of the breach, Ticketing and MPS have lost approximately 90% of the revenues they were receiving – approximately $200,000 per year - and expected to continue to receive for at least 10 years based on the Company's 13-year track record.

195.    Additionally, Pipeline was reasonably certain to receive the proceeds of a Shuttered Venue Operator Grant, which would have totaled approximately $1,200,000, and a Paycheck Protection Program grant, which would have had significant impact.

196.    Because S&A and Rumaner's breaches of the Operating Agreement completely torpedoed Pipeline's business, it was unable to use CrossroadsKC venue to get these grants.

197.    As a direct result of the breach, Plaintiffs have suffered damages equal to their costs and attorneys' fees incurred herein, which they are entitled to recover pursuant to the terms of the Operating Agreement.

198.    WHEREFORE, Plaintiffs pray for judgment in their favor against S&A and the Company under Count I of Plaintiffs' Complaint in an amount fair and reasonable to be determined after discovery and before trial, and for such other and further relief as this Court deems just and proper under the circumstances, including an award of their attorneys' fees, costs of suit, and interest.

## COUNT II - BREACH OF CONTRACT
### (Pipeline and Edmondson v. S&A)

199.    Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-198 above.

200.    The Operating Agreement of the Company constitutes a valid and enforceable contract under Missouri law.

34

201.   Pipeline and Edmondson have fully complied with their obligations under the Operating Agreement.

202.   S&A additionally breached the Operating Agreement as follows by:

   a.   Selling drinks inside Grinder's during Company events for less than Company bars were selling them for;

   b.   Refusing to allow the venue or VIP lounge to open outside of show days even though the Company paid rent year-round; and

   c.   Making the Company pay rent, utilities and maintenance for space it was not allowed to use.

203.   As a direct result of S&A's breach, Pipeline and Edmondson have suffered damages, including costs and attorneys' fees incurred herein, which they are entitled to recover pursuant to the terms of the Operating Agreement.

204.   WHEREFORE, Pipeline and Edmondson pray for judgment in their favor against S&A under Count II of Plaintiffs' Complaint in an amount fair and reasonable to be determined after discovery and before trial, and for such other and further relief as this Court deems just and proper under the circumstances, including an award of their attorneys' fees, costs of suit, and interest.

## COUNT III - BREACH OF FIDUCIARY DUTY
### (Plaintiffs v. S&A and Rumaner)

205.   Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-204 above.

206.   At all times relevant hereto, S&A, as the administrative member of the Company, and its president, Rumaner, owed fiduciary duties to Pipeline and Edmondson as members of

the Company, Mosiman, who ran its operations, and MPS and Ticketing, who provided essential services to the Company.

207.    At all times relevant hereto, S&A, as the majority owner with controlling authority, and its president, Rumaner, owed fiduciary duties to Pipeline and Edmondson as minority members of the Company, and Mosiman, who ran its operations, and MPS and Ticketing, who provided essential services to the Company.

208.    S&A covenanted and agreed that it was entering into the Operating Agreement based on their expectation that all members would continue as members and carry out the duties and obligations undertaken by them pursuant to the Agreement.

209.    S&A and Rumaner breached their fiduciary duty to Plaintiffs as follows by:

a.    Unilaterally locking out Pipeline, Edmondson and Mosiman, purporting to expel Pipeline and Edmondson as members, purporting to cancel the business, and terminating the lease so they could take the assets of the Company, including the improvements paid for by Pipeline and Edmondson, and operate essentially the same business without them;

b.    Conspiring with Mammoth, Fortier and Hunt to replace Pipeline, Edmondson and Mosiman;

c.    Falsely accusing Pipeline and Mosiman of embezzlement and mismanagement;

d.    Making defamatory statements about Pipeline and Mosiman;

e.    Misrepresenting to third parties, including artists, agencies, vendors and fans, that Pipeline and Edmondson have no right, title or interest in the Company;

f.        Threatening litigation against Pipeline, Edmondson and Mosiman;

g.        Trying to steal employees from the Company (and Pipeline);

h.        Stealing Pipeline's confidential information;

i.        Stealing trademarks and intellectual property;

j.        Sharing sensitive and proprietary information, documents, and photographs with a direct competitor;

k.        Passing off the Company's and Pipeline's trademarks and intellectual property as their own; and

l.        Copying the Company's and Pipeline's trademarks and intellectual property in a manner meant to confuse the public.

m.        Offering free viewing to Company events at Chance's deck;

n.        Selling tickets to Company events at Chance's deck in violation of artist contracts;

o.        Using the Company's leased venue and lounge for Grinder's benefit even though the Company could not;

p.        Undermining security by regularly circumventing the rules and making their own credentials for Company events; and

q.        Seating Grinder's patrons on the patio during Company events that had not purchased tickets.

210.    As a direct result of S&A and Rumaner's breach of fiduciary duty, Pipeline and Edmondson have suffered damages equal to the value of their membership interests on October 22, 2019, together with interest thereon through the date of judgment.

211.    As a direct result of S&A and Rumaner's breach of fiduciary duty, Pipeline and Edmondson have not been repaid their approximately $300,000 in investments and loans to the Company.

212.    As a direct result of S&A and Rumaner's breach of fiduciary duty, Pipeline has not been repaid the approximately $100,000 in unpaid salary, commission and expenses Mosiman is owed. Further, Mosiman has lost the salary and commissions he was receiving - approximately $72,000 per year – and expected to continue receiving for at least 10 years based on the Company's 13-year track record.

213.    As a direct result of S&A and Rumaner's breach of fiduciary duty, Ticketing and MPS have lost approximately 90% of the revenues they were receiving – approximately $200,000 per year - and expected to continue to receive for at least 10 years based on the Company's 13-year track record.

214.    As a direct result of S&A and Rumaner's breach of fiduciary duty, the reputation of Pipeline and Mosiman and their long-standing relationships with artists and fans were damaged and jeopardized.

215.    The acts of S&A and Rumaner were planned out and specifically timed to destroy the ability of Pipeline, Edmondson and Mosiman to recover and/or open a new music venue. S&A and Rumaner knew that booking began for the next season in August and September, right when they began attacking Pipeline and Mosiman. Further, S&A and Rumaner knew Mosiman was putting in offers for next season while they were plotting to steal the Company.

216.    Additionally, Pipeline was reasonably certain to receive the proceeds of a Shuttered Venue Operator Grant, which would have totaled approximately $1,200,000, and a Paycheck Protection Program grant, which would have had significant impact.

217.     Because S&A and Rumaner's breaches of fiduciary duty completely torpedoed Pipeline's business, it was unable to use CrossroadsKC venue to get these grants.

218.     The acts of S&A and Rumaner were willful and intentional and/or in reckless disregard of the rights of Plaintiffs and entitle them to punitive damages in an amount sufficient to deter S&A and Rumaner and others from like conduct in the future.

219.     WHEREFORE, Plaintiffs ask the Court for its judgment against S&A and Rumaner, and each of them, for actual damages in a fair and reasonable amount, for punitive damages in an amount sufficient to deter them and others from like conduct in the future, and for their costs, expenses and interest, as well as such other relief as the Court deems just and proper.

### COUNT IV - UNJUST ENRICHMENT
### (Pipeline, Edmondson, and Mosiman v. S&A and Rumaner)

220.     Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-219 above.

221.     As more fully set forth above, as a member of the Company, Pipeline and Edmondson had certain contractual rights and expectancies under the Operation Agreement. Further, Mosiman had certain rights and expectancies as third-party beneficiaries to the contract.

222.     As more fully set forth above, S&A owed Pipeline, Edmondson and Mosiman various fiduciary duties and obligations implied by law.

223.     Moreover, Pipeline, Edmondson and Mosiman were in a position of disadvantage so that certain material facts were not within their fair and reasonable reach. They were unable to discover certain concealed information and facts, although they exercised due diligence.

224.     In addition, as members of the Company, Pipeline and Edmondson trusted and relied upon S&A. They were in a subservient position, and S&A was in a dominant position, by

virtue of S&A's position as administrative member, S&A's position as the majority member, and S&A and Rumaner's undisclosed relationship with Mammoth, Fortier and Hunt.

225.     By virtue of the fiduciary duties they owed to Pipeline, Edmondson and Mosiman, S&A and Rumaner were obliged to inform them of all facts material to the ownership, finances and operations of the Company, which they failed and refused to do.

226.     Separate and distinct from their status as a member of the Company, S&A and Rumaner violated the fiduciary obligations they owed to Pipeline, Edmondson and Mosiman.

227.     In doing so, S&A and Rumaner fraudulently concealed their actions and conduct from Pipeline, Edmondson and Mosiman, acted knowingly and intentionally in doing so, and engaged in fraud and self-dealing in violation of their fiduciary obligations owed to them.

228.     Mosiman has, and during all relevant times did have, substantial expertise and experience in the live music industry and brought that expertise and experience to the Company when it first when into business. Pipeline and Mosiman designed the venue, built the venue, and paid for the improvements. They set up the best practices and ran the operations. Mosiman supplied his technical know-how; and, of course, Pipeline and Edmondson contributed their money as capital to make improvements and cover operating losses. As a result, Pipeline, Edmondson and Mosiman conferred a substantial benefit on S&A and Rumaner.

229.     Under the circumstances described herein, it would be inequitable for S&A and/or Rumaner to retain this substantial benefit.

230.     As a direct and proximate of S&A and Rumaner's conduct and the benefit conferred on them by Pipeline, Edmondson and Mosiman, each of them has been unjustly enriched in an amount to be proven at trial.

231.     As a result of the benefits conferred on S&A and Rumaner by Pipeline, Edmondson and Mosiman, S&A and Rumaner are trustees of the gains they have received from those benefits, and a court of equity is required to impose a constructive trust on their interest in the Company and its assets and earnings.

232.     WHEREFORE, Pipeline, Edmondson, and Mosiman pray the Court enters a judgment in their favor on Count IV of their Complaint against S&A and Rumaner, jointly and severally imposing a constructive trust on their interest in the Company and the gains they have received as a result of the benefits conferred on them by Plaintiffs, plus interest, attorneys' fees and costs incurred in bringing this action, and for such other and further relief as the Court deems just and proper.

## COUNT V - TORTIOUS INTEFERENCE WITH CONTRACT
### (Plaintiffs v. S&A and Rumaner)

233.     Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-232 above.

234.     The Operating Agreement constituted a valid and enforceable contract between Pipeline and Edmondson and the Company.

235.     Mosiman, Ticketing and MPS were third party beneficiaries of the contract.

236.     S&A breached the Operating Agreement as set forth above.

237.     S&A and Rumaner caused the Company to breach and/or terminate its contract with Pipeline and Edmondson, by and through their scheme of accusing Pipeline and Mosiman of embezzlement and mismanagement, locking them out of the venue, and purporting to cancel the business for their own personal profit.

238.     The acts of S&A and Rumaner were intentional and without justification or excuse.

41

239. As a direct result of their acts, Pipeline and Edmondson have suffered damages equal to the value of their membership interests on October 22, 2019, together with interest thereon through the date of judgment.

240. As a direct result of their acts, Pipeline and Edmondson have not been repaid their approximately $300,000 in investments and loans to the Company.

241. As a direct result of their acts, Pipeline has not been repaid the approximately $100,000 in unpaid salary, commission and expenses Mosiman is owed. Further, Mosiman has lost the salary and commissions he was receiving - approximately $72,000 per year – and expected to continue receiving for at least 10 years based on the Company's 13-year track record.

242. As a direct result of their acts, Ticketing and MPS have lost approximately 90% of the revenues they were receiving – approximately $200,000 per year - and expected to continue receiving for at least 10 years based on the Company's 13-year track record.

243. As a direct result of S&A and Rumaner's breach of fiduciary duty, the reputation of Pipeline and Mosiman and their long-standing relationships with artists and fans were damaged and jeopardized.

244. The acts of S&A and Rumaner were planned out and specifically timed to destroy the ability of Pipeline, Edmondson and Mosiman to recover and/or open a new music venue. S&A and Rumaner knew that booking began for the next season in August and September, right when they began attacking Pipeline and Mosiman. Further, S&A and Rumaner knew Mosiman was putting in offers for next season while they were plotting to steal the Company.

245. Plaintiffs also had numerous existing contracts with sponsors, vendors, ticketing companies, artists, and agents.

246.     Edmondson, Mosiman, PLT, and MPS were third-party beneficiaries to those contracts.

247.     S&A and Rumaner were aware of these contracts. In fact, S&A and Rumaner specifically worked to steal these contracts and make them their own.

248.     S&A and Rumaner caused these sponsors, vendors, ticketing companies, artists, and agents to cease and/or breach their existing contracts with Plaintiffs.

249.     As a direct result of S&A and Rumaner's actions, Plaintiffs lost out on commissions and service charges that they would have otherwise received.

250.     Additionally, Pipeline was reasonably certain to receive the proceeds of a Shuttered Venue Operator Grant, which would have totaled approximately $1,200,000, and a Paycheck Protection Program grant, which would have had significant impact.

251.     Because the tortious actions of S&A and Rumaner completely torpedoed Pipeline's business, it was unable to use CrossroadsKC venue to get these grants.

252.     The acts of S&A and Rumaner were willful and intentional and/or in reckless disregard of the rights of Plaintiffs and entitle them to punitive damages in an amount sufficient to deter S&A and Rumaner and others from like conduct in the future.

253.     WHEREFORE, Plaintiffs ask the Court for its judgment against S&A and Rumaner, and each of them, for actual damages in a fair and reasonable amount, together with interest, for punitive damages in an amount sufficient to deter them and others from like conduct in the future, for their costs and expenses, and for such other relief as the Court deems just and proper.

## COUNT VI - TORTIOUS INTEFERENCE WITH CONTRACT
### (Plaintiffs v. Mammoth, Fortier, Hunt, Becker, and Eleven)

254.     Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-253 above.

255.     The Operating Agreement constituted a valid and enforceable contract between Pipeline and Edmondson, S&A and the Company.

256.     Mosiman, Ticketing and MPS were third party beneficiaries of the contract.

257.     S&A and the Company breached the Operating Agreement as set forth above.

258.     Mammoth, Fortier, Hunt, Becker, and Eleven intentionally caused S&A and the Company to breach and/or terminate their contract with Pipeline and Edmondson, by and through their scheme with S&A and Rumaner to oust Pipeline and Edmondson.

259.     The acts of Mammoth, Fortier, Hunt, Becker, and Eleven were intentional and without justification or excuse.

260.     Mammoth, Fortier, Hunt, Becker, and Eleven were aware of the Operating Agreement, or at the very least were aware that S&A, Pipeline, and Edmondson were running the Company pursuant to an agreement.

261.     As a direct result of their acts, Pipeline and Edmondson have suffered damages equal to the value of their membership interests on October 22, 2019, together with interest thereon through the date of judgment.

262.     As a direct result of their acts, Pipeline and Edmondson have not been repaid their approximately $300,000 in investments and loans to the Company.

263. As a direct result of their acts, Pipeline has not been repaid the approximately $100,000 in unpaid salary, commission and expenses Mosiman is owed. Further, Mosiman has lost the salary and commissions he was receiving - approximately $72,000 per year – and expected to continue receiving for at least 10 years based on the Company's 13-year track record.

264. As a direct result of their acts, Ticketing and MPS have lost approximately 90% of the revenues they were receiving – approximately $200,000 per year - and expected to continue receiving for at least 10 years based on the Company's 13-year track record.

265. As a direct result of Mammoth, Fortier, Hunt, Becker, and Eleven's tortious interference, the reputation of Pipeline and Mosiman and their long-standing relationships with artists and fans were damaged and jeopardized.

266. The acts of Mammoth, Fortier, Hunt, and Becker, and Eleven were planned out and specifically timed to destroy the ability of Pipeline, Mosiman and Edmondson to recover and/or open a new music venue. Mammoth, Fortier, Hunt, Becker, and Eleven knew that booking began for the next season in August and September, right when they made their move. Further, Mammoth, Fortier, Hunt, Becker, and Eleven knew Mosiman was putting in offers for next season while they were plotting to steal the Company.

267. Plaintiffs also had numerous existing contracts with sponsors, vendors, ticketing companies, artists, and agents.

268. Edmondson, Mosiman, PLT, and MPS were third-party beneficiaries to those contracts.

269. Mammoth, Fortier, Hunt, Becker, and Eleven were aware of these contracts. In fact, Mammoth, Fortier, Hunt, Becker, and Eleven specifically worked to steal these contracts and make them their own.

45

270.     Mammoth, Fortier, Hunt, Becker, and Eleven caused these sponsors, vendors, ticketing companies, artists, and agents to cease and/or breach their existing contracts with Plaintiffs.

271.     As a direct result of Mammoth, Fortier, Hunt, Becker, and Eleven's actions, Plaintiffs lost out on commissions and service charges that they would have otherwise received.

272.     Additionally, Pipeline was reasonably certain to receive the proceeds of a Shuttered Venue Operator Grant, which would have totaled approximately $1,200,000, and a Paycheck Protection Program grant, which would have had significant impact.

273.     Because the actions of Mammoth, Fortier, Hunt, Becker, and Eleven completely torpedoed Pipeline's business, it was unable to use CrossroadsKC venue to get these grants.

274.     The acts of Mammoth, Fortier, Hunt, Becker, and Eleven were willful and intentional and/or in reckless disregard of the rights of Plaintiffs and entitle them to punitive damages in an amount sufficient to deter Mammoth, Fortier and Hunt and others from like conduct in the future.

275.     WHEREFORE, Plaintiffs ask the Court for its judgment against Mammoth, Fortier, Hunt, Becker, and Eleven and each of them, for actual damages in a fair and reasonable amount, together with interest, for punitive damages in an amount sufficient to deter them and others from like conduct in the future, for their costs and expenses, and for such other relief as the Court deems just and proper.

### COUNT VII- TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCIES
### (Plaintiffs v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)

276.     Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-275 above.

277.    Plaintiffs had business expectancies with a number of sponsors, artists, agents, ticketing companies, and vendors.

278.    Plaintiffs had long-lasting relationships with these sponsors, artists, agents, ticketing companies, and vendors that were expected to continue. Business with sponsors, vendors, and ticketing companies often renewed annually, while business with artists and agents was contingent on touring schedules, which were usually every two years.

279.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven were aware of these business expectancies. In fact, S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven specifically worked to steal these expectancies and make them their own.

280.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven specifically targeted sponsors, artists, agents, ticketing companies, and vendors that Plaintiffs had previously worked with.

281.    These business expectancies were breached due to S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven's intentional interference.

282.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven had no justification for interfering with Plaintiffs' business expectancies. Instead, they were motivated by greed and a desire to eliminate Plaintiffs from the industry and as competition.

283.    As a direct result of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven's tortious interference with Plaintiffs' business expectancies, Plaintiffs suffered financial and reputational damages.

284.    The acts of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven were planned out and specifically timed to destroy the ability of Plaintiffs to recover their business expectancies.

285.     Additionally, Pipeline was reasonably certain to receive the proceeds of a Shuttered Venue Operator Grant, which would have totaled approximately $1,200,000, and a Paycheck Protection Program grant, which would have had significant impact.

286.     Because the actions of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven completely torpedoed Pipeline's business, it was unable to use CrossroadsKC venue to get these grants.

287.     The acts of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven were willful and intentional and/or in reckless disregard of the rights of Plaintiffs and entitle them to punitive damages in an amount sufficient to deter Mammoth, Fortier, Hunt, Becker, and Eleven and others from like conduct in the future.

288.     WHEREFORE, Plaintiffs ask the Court for its judgment against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven and each of them, for actual damages in a fair and reasonable amount, together with interest, for punitive damages in an amount sufficient to deter them and others from like conduct in the future, for their costs and expenses, and for such other relief as the Court deems just and proper.

## COUNT VIII- DEFAMATION
**(Pipeline, Mosiman and Ticketing v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)**

289.     Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-288 above.

290.     S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven collaborated together to write a letter to E-Tix that was patently and provably false in order to gain access to Pipeline's customer database and their e-mails.

48

291. All parties had input into the letter. Becker wrote the initial draft, and the other parties gave edits and input.

292. This letter was published and sent to E-Tix on February 19, 2020.

293. Notably, the following statements, without limitation, were untrue:

    a. "We have come to learn that [Mosiman] was not an honest partner. Since day one-he was supposed to be sharing in all revenue and information, but, over the years he created new entities, redirected funds, obfuscated the money trail, cut side deals and was anything but transparent with his partners."

    b. "Over the years Brett defrauded the partnership. In 2019 he was removed from our partnership for his immoral business practices and hiding revenue from our partnership for fifteen years – forcing us to mend many broken sponsorship, ticketing, and business relationships, as well as more than a few that he had created without our even knowing."

    c. "One of the side-deals he cut was moving ticketing from Ticketfly to ETix. Grinders Crossroads was given zero info of this change when it occurred."

    d. "[W]e have learned that Brett Mosiman will not allow us access to OUR account information, nor the emails of crossroads ticket purchasers. Even though we are the venue, he signed the contract without us knowing and kept a health cash advance via PLT, LLC, not shared with his partners as dictated by the operating agreement of the partnership entity."

294. Rumaner's assistant, Thom Walker, signed the letter on behalf of Rumaner and S&A and indicated that CrossroadsKC was the d/b/a of S&A, which is untrue.

295.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven knew that the content of the letter was false when they drafted it. Becker even specifically worried it was "defamation of character."

296.    E-Tix is one of the largest web-based ticketing service providers in the world, and Plaintiffs' reputation with E-Tix was severely damaged by the defamatory comments.

297.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven have also made defamatory comments to members of the music industry, including sponsors, agents, artists, fans, competitors, and vendors.

298.    For example, Fortier e-mailed an agent: "Brett has not settled with us for the Griz show at Crossroads… He has issues with the artist settlement and the fact we paid you what we did. He told me he had emotional issues with the settlement. Although it's not your problem I wanted you to be aware. We are sending a demand letter next week. Please put him on the f**k you list for us. Cheers. . ." When he told the agent to blackball Mosiman, Fortier neglected to tell him that he had stolen his business from Mosiman.

299.    The content of this e-mail was false and misleading because Fortier had spent years trying to steal Mosiman's business, Fortier knew it was only partially true, and he intended to damage Pipeline and Mosiman and remove them from the industry and as a competitor.

300.    Upon information and belief, S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven have made similarly defamatory statements, both written and verbal, to members of the music industry.

301.    Reputation is everything in the music industry, and S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven have damaged Pipeline, Mosiman, and Ticketing's reputation with these defamatory comments.

50

302.     The acts of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven were willful and intentional and/or in reckless disregard of the rights of Pipeline, Mosiman, and Ticketing and entitle them to punitive damages in an amount sufficient to deter Mammoth, Fortier, Hunt, Becker and Eleven and others from like conduct in the future.

303.     WHEREFORE, Pipeline, Mosiman, and Ticketing ask the Court for its judgment against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven and each of them, for actual damages in a fair and reasonable amount, together with interest, for punitive damages in an amount sufficient to deter them and others from like conduct in the future, for their costs and expenses, and for such other relief as the Court deems just and proper.

## COUNT IX – CIVIL CONSPIRACY
### (Plaintiffs v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)

304.     Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1-303 above.

305.     Upon information and belief, S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven entered into an overt agreement and understanding at a time presently unknown to Plaintiffs (but months before the end of the season when Rumaner locked Pipeline, Edmondson and Mosiman out of the venue) to commit various illegal and improper acts as further described in this Amended Complaint.

306.     The acts of the conspiracy of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven include, but are not necessarily limited to, those described in this Complaint and have caused damage to Plaintiffs.

307.     The conspiracy of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven as described herein and the acts taken pursuant to such conspiracy were willful, intentional, wanton and malicious and deliberately intended to inflict serious economic harm on Plaintiffs.

51

308.　WHEREFORE, Plaintiffs ask the Court for its judgment against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven and each of them, for actual damages in a fair and reasonable amount, together with interest, for punitive damages in an amount sufficient to deter them and others from like conduct in the future, for their costs and expenses, and for such other relief as the Court deems just and proper.

## COUNT X - TAMPERING WITH COMPUTER DATA
### (PURSUANT TO § 537.525 R.S.Mo.)
### (Pipeline v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)

309.　Plaintiffs incorporates by reference as if fully restated herein their allegations pleaded in paragraphs 1 - 308 above.

310.　Mammoth, Fortier, Hunt, Becker, and Eleven knew that, at all times material hereto, S&A, through Rumaner, was a member of the Company.

311.　While S&A was a member of the Company, Mammoth, Fortier, Hunt, Becker, and Eleven engaged in a civil conspiracy with Rumaner whereby among other things, they (a) unlawfully accessed and tampered with the Company's and Pipeline's social networks and websites and (b) disclosed and transmitted misappropriated data, documentation, trade secrets and proprietary and confidential information wrongfully obtained by them. This includes, but is not limited to, sponsorship documents, show history, profits and losses, customer databases, and e-mail lists.

312.　In so doing, Mammoth, Fortier, Hunt, Becker, and Eleven acting by and through their authorized agents, including but not necessarily limited to, Rumaner, received, retained, used or disclosed data they knew or should have known or believed was obtained in violation of § 569.095 R.S.Mo.

313.     Mammoth, Fortier, Hunt, Becker, and Eleven had no reasonable grounds to believe that Rumaner was authorized to misappropriate, tamper with, access and disclose the subject data and information wrongfully taken from Pipeline's computers by Rumaner.

314.     Mammoth, Fortier, Hunt, Becker, and Eleven had no reasonable grounds to believe they were authorized to misappropriate, tamper with, access and disclose the subject data and information that they wrongfully took from Pipeline's computers.

315.     In this regard, Mammoth, Fortier, Hunt, Becker, and Eleven, by and through the actions of their authorized agents acted individually and as authorized agents for each other and for S&A and Rumaner.

316.     In misappropriating, tampering with, accessing, and disclosing the subject data and information, Fortier, Hunt, and Becker acted for their own benefit, in addition to the benefit of Mammoth and Eleven.

317.     As a direct and proximate result of these actions, Pipeline has suffered actual losses to be determined after discovery and before trial, including expenses necessary to ascertain the extent of the compromise and damage to the security and integrity of the unlawfully accessed social networks and websites.

318.     S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven have profited from the unlawful and improper actions as described above and must disgorge any ill-gotten gains, including and profits realized from their improper actions to date.

319.     These violations of the Missouri computer tampering statutes as described herein were willful, intentional and specifically calculated to enrich S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven, and inflict economic harm on Pipeline and, as such, merit an award of punitive damages.

320.     WHEREFORE, Pipeline prays for judgment in its favor against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven under Count XI of Plaintiffs' Complaint in an amount fair and reasonable to be determined after discovery and before trial, together with punitive damages to punish them for their wrongful conduct and to deter them and others from engaging in like conduct in the future, and for such other and further relief as this Court deems just and proper under the circumstances, including an award attorneys' fees, costs of suit, and interest.

## COUNT XI - LANHAM ACT (FALSE ASSOCIATION)
### (PURSUANT TO 15 U.S.C. § 1125(a)(1)(A))
### (Pipeline v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)

321.     Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1 - 320 above.

322.     The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

a.  Civil action

(1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which---

(A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person…

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

323. Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven, acting together, falsely misled customers and prospective customers, agents, artists, vendors, and sponsors by suggesting they were associated with the Company and acting on the Company's behalf during the time S&A was a member of the Company. Rather, they were brokering business for the benefit of Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven.

324. By way of specific example, offers, posters, digital marketing, tickets, and other items used the Company's name and logo, CrossroadsKC (designed, controlled and owned by Pipeline) on e-mail and other communications with customers, prospective customers, sponsors, agents, artists, and vendors and solicited business through the Company's e-mail accounts in an effort to secure business that was actually diverted to Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven. Notably, as many as thirty offers were sent out to agents by Mammoth (via Fortier, Hunt, Becker and Eleven) used the CrossroadsKC name.

325. This wrongfully suggested that the Company (and by association, Pipeline) remained associated with the Venue and that Plaintiffs sponsored and/or approved of the acts of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven. It also wrongfully suggested that Mammoth, Fortier, Hunt, Becker, and Eleven were associated with the Company and its 13-year history.

326. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven, acting together, used the Company's CrossroadsKC name and common law trademark to deceive and confuse the Company's customers, prospective customers, agents, artists, sponsors, and vendors in interstate commerce regarding the association of the products or services that were to be provided in connection with their efforts to unlawfully divert business from the Company, to Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven.

327.    This false association was deceptive, material and influenced the purchasing decisions of some of the Company's customers, agents, sponsors, and vendors.

328.    In this regard, these Defendants acted both individually (S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven) and through their agents, and for the benefit of each other.

329.    In falsely associating themselves with the Company and Pipeline, Fortier, Hunt, and Becker acted for their own benefit, in addition to the benefit of Mammoth and Eleven.

330.    As a direct and proximate result of their actions as set forth above, Pipeline has suffered actual losses to be determined after discovery and before trial, in addition to the costs of maintaining this action.

331.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven have profited from their unlawful and improper actions as described above and must disgorge any ill-gotten gains, including and profits realized from their improper actions to date or to the extent applicable, in the future.

332.    Pursuant to 15 U.S.C. § 1117(a)(3), in assessing damages for these Lanham Act violations complained of herein, the Court may enter judgment for any sum above the amount found as actual damages up to three times that amount together with a reasonable attorneys' fee.

333.    These Lanham Act violations as described herein were willful, intentional and specifically calculated to enrich S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven and inflict economic harm on the Company and Pipeline and, as such, merit an award of exemplary damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a)(3).

334.   WHEREFORE, Pipeline prays for judgment in its favor against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven under Count XII of Plaintiffs' Complaint in an amount fair and reasonable equal to three times the amount of actual damages determined at trial, disgorgement of profits, and for such other and further relief as this Court deems just and proper under the circumstances, together with an award of attorneys' fees, costs of suit, and interest.

**COUNT XII - LANHAM ACT (FALSE ADVERTISING)**
**(PURSUANT TO 15 U.S.C. § 1125(a)(1)(B))**
**(Pipeline v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)**

335.   Plaintiffs incorporate by reference as if fully restated herein their allegations pleaded in paragraphs 1 – 334 above.

336.   The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

    a.   Civil action

        (1)   Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which---

        (B)   in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

        (2)   shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

337.   Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven, acting together, falsely misled customers and prospective customers by suggesting they were advertising on behalf of the company and acting on the Company's behalf during the time S&A was a member of the Company but were brokering business for the benefit of Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven.

338. By way of specific example, posters, digital marketing, tickets, and other items used the Company's name and logo, CrossroadsKC (designed, controlled and owned by Pipeline) on e-mail and other communications with customers and prospective customers and solicited business through the Company's e-mail accounts in an effort to secure business that was actually diverted to Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven.

339. This wrongfully suggested that the Company (and by association, Pipeline) was advertising for the Venue and that Plaintiffs sponsored and/or approved of the advertisements and acts of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven.

340. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven, acting together, advertised using the Company's CrossroadsKC name and common law trademark to deceive and confuse the Company's customers and prospective customers in interstate commerce about the origin and quality of the products or services that were to be provided.

341. CrossroadsKC was consistently voted among the best music venues in Kansas City and the Midwest, and in advertising shows as CrossroadsKC, S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven falsely represented the quality of their shows and production.

342. Even now that S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven use "GrindersKC" instead of "CrossroadsKC" or "Grinders Crossroads," as the name of the Venue, they continue misrepresent GrindersKC's quality, history, and origin. The GrindersKC Facebook account says "GrindersKC Event Venue is KC's premier outdoor music & event venue downtown & won USA Today's #1 spot in its 10Best list for both Live Music & Night Life. Established in 2004 – Rocking Kansas City." However, GrindersKC has only existed for several months. It has not been around for fifteen years, it was not established in 2004, and it did not win the USA Today's $1 spot in its 10Best list.

343.    The USA Today article (about CrossroadsKC, not GrindersKC), available at https://www.10best.com/destinations/_missouri/kansas-city/nightlife/live-music/, even references Pipeline Productions by name.

344.    The GrindersKC Twitter account, @grinders_KC, states "Live music outdoors in the crossroads district for fifteen years."

345.    GrindersKC has not been putting on live music outdoors in the crossroads district for fifteen years.

346.    A sign in the venue states, "GRINDERS KC, WHERE ART, FOOD & MUSIC COLLIDE. est. 2004." GrindersKC was not established in 2004.

347.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven specifically have been attempting to use the Company's history in their advertising, when the Company's history was not theirs to use.

348.    This false advertising was deceptive, material and influenced the purchasing decisions of some of the Company's customers, agents, sponsors, and vendors.

349.    In this regard, these Defendants acted both individually (S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven) and through their agents, and for the benefit of each other.

350.    In falsely advertising either as CrossroadsKC or as the proper holder of CrossroadsKC's history, Fortier, Hunt, and Becker acted for their own benefit, in addition to the benefit of Mammoth and Eleven.

351.    As a direct and proximate result of their actions as set forth above, Pipeline has suffered actual losses to be determined after discovery and before trial, in addition to the costs of maintaining this action.

352. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven have profited from their unlawful and improper actions as described above and must disgorge any ill-gotten gains, including and profits realized from their improper actions to date or to the extent applicable, in the future.

353. Pursuant to 15 U.S.C. § 1117(a)(3), in assessing damages for these Lanham Act violations complained of herein, the Court may enter judgment for any sum above the amount found as actual damages up to three times that amount together with a reasonable attorneys' fee.

354. These Lanham Act violations as described herein were willful, intentional and specifically calculated to enrich S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven and inflict economic harm on the Company and Pipeline and, as such, merit an award of exemplary damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a)(3).

355. WHEREFORE, Pipeline prays for judgment in its favor against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven under Count XIV of Plaintiffs' Complaint in an amount fair and reasonable equal to three times the amount of actual damages determined at trial, for disgorgement of profits, and for such other and further relief as this Court deems just and proper under the circumstances, together with an award of attorneys' fees, costs of suit, and interest.

## COUNT XIII- COMMON LAW UNFAIR COMPETITION
### (Pipeline v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)

356. Plaintiffs incorporates by reference as if fully restated herein its allegations pleaded in paragraphs 1 – 355 above.

357. Pipeline owns a valid, protectable service mark.

358. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven are direct competitors with Pipeline and provide substantially similar services to Pipeline, leading to

60

consumer confusion when S&A, Rumaner, Fortier, Hunt, and Becker purported to be acting on behalf of the Company, when they were instead acting on their own behalf.

359.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven's anti-competitive actions include, but are not limited to, using and/or continuing to use in commerce false designations of origin and quality, obtaining Pipeline's customer database and e-mail list, falsely attributing the Company's history as their own, and accessing Pipeline's social media and website without authorization.

360.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven had an economic motivation for these actions, as they were incentivized to harness Pipeline and the Company's good will and reputation and pass off the Company and the Venue as their own.

361.    Additionally, Mammoth, Fortier, Hunt, Becker, and Eleven have illegally and unjustifiably attempted to remove Pipeline from the industry as their competition and monopolize concert production in the Midwest region.

362.    Mammoth has obtained exclusivity at venues all throughout Kansas City where Pipeline and other production companies used to put on concerts and musical events. Mammoth has exclusivity at GrindersKC, Liberty Hall, Granada, The Madrid, Bottleneck, Uptown, Cotillion, Sandstone, and used to have exclusivity at the Beaumont Club before it closed. Mammoth does this with the purpose of preventing fair competition and removing competitors from the industry in at least three Midwest markets, including Kansas City, Lawrence, and Wichita. While they maintain that Pipeline still has access to these venues, they purport the opposite to agents within the industry by saying they have exclusive rights.

363.    Mammoth, Fortier, Hunt, Becker, and Eleven have also been contacting agents, artists, sponsors, and vendors and attempting to blackball Pipeline from the industry.

364. Pipeline is Mammoth's main competitor. Mammoth, Fortier, Hunt, Becker, and Eleven had an economic motivation for their anticompetitive activity, as they were incentivized to reduce competition within their industry.

365. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven's actions are likely to negatively influence purchasing decisions by customers, prospective customers, agents, artists, vendors, and sponsors and unfairly divert business away from Plaintiffs.

366. The actions of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven are far-reaching and constitute promotion within the industry of music and concert production.

367. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven's actions were material, in that they were instrumental in promoting unfair competition within the industry.

368. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven's actions caused injury to Pipeline, as Pipeline lost costumers and prospective customers and had their sales negatively impacted.

369. The acts of S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven were willful and intentional and/or in reckless disregard of the rights of Pipeline and entitles Pipeline to punitive damages in an amount sufficient to deter Mammoth, Fortier, Hunt, Becker, and Eleven and others from like conduct in the future.

370. WHEREFORE, Pipeline asks the Court for its judgment against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven and each of them, for actual damages in a fair and reasonable amount, together with interest, for punitive damages in an amount sufficient to deter them and others from like conduct in the future, for its costs and expenses, and for such other relief as the Court deems just and proper.

## COUNT XIV - MISAPPROPRIATION OF TRADE SECRETS (VIOLATION OF THE MISSOURI UNIFORM TRADE SECRETS ACT - § 417.450, et seq.) (Pipeline v. S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven)

371.     Plaintiffs incorporates by reference as if fully restated herein its allegations pleaded in paragraphs 1 – 370 above.

372.     During its membership in the Company, S&A and Rumaner were aware of valid business expectancies and ongoing relationships between Pipeline and their customers, which S&A, through Rumaner, was tasked to further and maintain for the Company's benefit.

373.     Pipeline has made a substantial investment in money, time, manpower, research, technology and other resources in developing its business, its service offerings, its processes and business methods and in developing and maintaining its customer relationships and customer contacts. Over the years, such expenses have included the research and development of proprietary and confidential marketing and sales strategies and plans and the implementation of the same, together with proprietary and confidential processes, methods, business practices and pricing policies. Such information, which Pipeline treats as confidential and proprietary information and trade secrets, constitutes not only a current, but also a prospective, economic advantage in Pipeline's highly competitive industry.

374.     Pipeline has also incurred substantial expense and made significant investment in establishing, developing and maintaining customer leads and customer relationships including, but not limited to, investing substantial sums of money in compensating current and former employees to both bring customer leads and customer relationships to Pipeline for the Company's benefit and profit, and to encourage employees to foster and grow Pipeline's customer leads and relationships for the Company's benefit. Each such customer relationship constitutes a valuable and unique asset to Pipeline and additionally constitutes a prospective economic advantage.

63

375.    Access to and contact with Pipeline's trade secrets, confidential and proprietary information, product and service development data, marketing information, customer and prospective customer information, customer accounts, customer lists, product and service information, sponsorship information, vendor information, cost information and pricing information are all legitimate business interests that Pipeline has sought and has a right to protect.

376.    Pipeline's trade secrets, confidential and proprietary information, product and service development data, marketing information, customer and prospective customer information, customer accounts, customer lists, product and service information, sponsorship information, vendor information, cost information and pricing information are not readily available to the general public, have not become generally known in Pipeline's industry, and the improper or unauthorized revelation of such information to Pipeline's competitors (like Mammoth, Fortier, Hunt, Becker, and Eleven) would have (and now has had) a detrimental impact upon the continued economic health of Pipeline.

377.    Pipeline's confidential and proprietary information, product and service development data, marketing information, customer and prospective customer information, customer accounts, customer lists, product and service information, sponsorship information, vendor information, cost information and pricing information, data and information maintained on its computers, networks, systems, databases, programs and devices, among other things, constitute trade secrets within the meaning of § 417.453(4) R.S.Mo.

378.    S&A and Rumaner knew or should have known that they were not authorized to disclose to Mammoth, Fortier, Hunt, Becker, and Eleven any of Pipeline's and/or the Company's trade secrets without Pipeline's consent.

379.    Mammoth, Fortier, Hunt, Becker, and Eleven knew or should have known that S&A and Rumaner were not authorized to disclose to Mammoth, Fortier, Hunt, Becker, and Eleven any of Pipeline's trade secrets without Pipeline's consent.

380.    Upon information and belief, S&A, through Rumaner, knowingly misappropriated Pipeline's trade secrets by, among other things, acquiring the same by improper means (and in excess of his authorized access and use of the same) and by disclosing the same to Mammoth, Fortier, Hunt, Becker, and Eleven all without Pipeline's consent.

381.    Mammoth, Fortier, Hunt, Becker, and Eleven knowingly misappropriated Pipeline's trade secrets by, among other things, acting in concert with S&A and Rumaner, by acquiring the same from him knowing or having reason to know that the subject trade secrets were derived from a person (Rumaner) who had utilized improper means to acquire the trade secrets or from a person (Rumaner) who owed a duty to Pipeline to maintain their secrecy or limit their use.

382.    S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven also knowingly misappropriated Pipeline's trade secrets by collaborating on the defamatory letter to obtain Pipeline's customer database and e-mail lists from E-Tix and collaborating in their effort to obtain Plaintiffs' social media and website.

383.    After misappropriating Pipeline's trade secrets, S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven, acting together, utilized Pipeline's trade secrets and confidential and proprietary information to obtain an unfair competitive advantage in the marketplace.

384.    In this regard, Rumaner, S&A, Mammoth, Fortier, Hunt, Becker, and Eleven, by and through the actions of their authorized agents each acted individually and as authorized agents for each other.

385.     In misappropriating Pipeline's trade secrets, Fortier, Hunt, and Becker acted for their own benefit, in addition to the benefit of Mammoth and Eleven.

386.     As a direct and proximate result of S&A, Rumaner, Fortier, Hunt, Becker, and Eleven's actions as set forth above, Pipeline has suffered actual losses in an amount to be determined after discovery and before trial.

387.     S&A, Rumaner, Fortier, Hunt, Becker, and Eleven have profited from the unlawful and improper actions as described above and must disgorge any ill-gotten gains, including and profits realized from their improper actions to date.

388.     These violations of the Missouri Uniform Trade Secrets Act as described herein were outrageous because of the misappropriators' evil motive or reckless indifference to the rights of Pipeline, and therefore, pursuant to § 417.457.2 R.S.Mo., merit an award of punitive damages.

389.     WHEREFORE, Pipeline prays for judgment in its favor against S&A, Rumaner, Mammoth, Fortier, Hunt, Becker, and Eleven under Count XV of Plaintiffs' Complaint in an amount fair and reasonable to be determined after discovery and before trial, together with punitive damages to punish them for their wrongful conduct and to deter them and others from engaging in like conduct in the future, and for such other and further relief as this Court deems just and proper under the circumstances.

## COUNT XV - ACTION FOR JUDICIAL DISSOLUTION
### (Pipeline and Edmondson v. S&A and Company)

390.     Plaintiffs incorporate by reference as if fully restated herein its allegations pleaded in paragraphs 1 - 389 above.

391.     At all times after October 22, 2019, S&A and the Company have exceeded the authority conferred on them by law.

392.    At all times after October 22, 2019, S&A and the Company have carried on, conducted and/or transacted the business of the Company in a fraudulent and/or illegal manner.

393.    At all times after October 22, 2019, S&A and the Company have abused their powers contrary to the public policy of the State of Missouri.

394.    As a result of these actions, Pipeline and Edmondson are entitled to the judicial dissolution of the Company, to the recovery of the value of their interest in the Company, together with interest, and the recovery of their costs incurred herein, including reasonable attorneys' fees.

395.    WHEREFORE, Pipeline and Edmondson ask the Court for its judgment declaration that the Company be judicially dissolved, for its liquidation of the assets of the Company, and for its monetary judgment against S&A and the Company in an undetermined amount equaling the value of their interest in the Company, together with interest, and the recovery of their costs incurred herein, including reasonable attorneys' fees, and for such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a jury trial for all the claims so triable.

Dated: October 16, 2021                    Respectfully submitted,

|  | MCINNES LAW LLC |
|  | By: _/s/ Jack McInnes_ |
|  | Jack D. McInnes (MO #56904) |
|  | Benjamin D. Ashworth (MO # 67933) |
|  | 1900 West 75th Street, Suite 220 |
|  | Prairie Village, Kansas  66208 |
|  | Telephone: (913) 220-2488 |
|  | Facsimile: (913) 273-1671 |
|  | jack@mcinnes-law.com |
|  | ben@mcinnes-law.com |
|  | |
|  | ATTORNEYS FOR PLAINTIFFS |

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court via CM/ECF and served on counsel for Defendants through the Notice of Electronic Filing.


By: _/s/ Jack D. McInnes_